Eugene **MENARD**, Plaintiff, Appellant,

v.

**FIRST SECURITY SERVICES CORPORATION**, Defendant, Appellee.

No. 87–1772.

United States Court of Appeals, First Circuit.

Heard Jan. 8, 1988.

Decided May 26, 1988.

Paul A. Manoff, Boston, Mass., for plaintiff, appellant.

Joseph W. Ambash with whom Kevin J. Fitzgerald, R. Michael Cassidy and Foley, Hoag & Eliot, Boston, Mass., were on brief for defendant, appellee.

Before CAMPBELL, Chief Judge, TORRUELLA and SELYA, Circuit Judges.

LEVIN H. CAMPBELL, Chief Judge.

Plaintiff-appellant Eugene Menard appeals from the district court's grant of summary judgment in favor of defendant-appellee First Security Services Corporation ("First Security"). Menard brought this action alleging that First Security discharged him from the position of Area Manager on account of his age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.* (1982 & Supp. II 1984), and the Massachusetts Anti–Discrimination Act, Mass.Gen. Laws ch. 151B (1982 & Supp.1988). He also charged that First Security committed a breach of contract under Massachusetts law, by firing him in violation of the policies and procedures established in its personnel handbook. Plaintiff further alleged that First Security had not paid him a bonus that was agreed upon by the parties. After completion of substantial discovery, the district court allowed defendant's motion for summary judgment on all counts on March 26, 1987. The court gave no reason other than citing this court's opinion in *Dea v. Look,* 810 F.2d 12 (1st Cir.1987).[1] Menard appeals from the district court's grant of summary judgment on both the ADEA and contract claims.[2]

I.

Because this is an appeal from summary judgment in favor of the defendant, we state the facts in the light most favorable to the plaintiff. *Metropolitan Life Insurance Co. v. Ditmore,* 729 F.2d 1, 4 (1st Cir.1984). First Security is one of the largest, privately owned security companies in New England. Menard was hired by defendant in January 1981 at the age of 52, as part of First Security's management team. He was discharged in March 1984, by which time he was age 55.

Menard's first assignment for defendant was as Wang Operation Manager, a post he had from February 1981 to August 1982. As Wang Operation Manager, he was responsible for the day-to-day management of uniformed security services for Wang Laboratories facilities. Plaintiff's immediate supervisors, Robert Jackson and Ronald DeLia, praised his performance as Wang Operation Manager. On February 22, 1982, DeLia wrote Menard a letter describing his performance at Wang over the past 12 months as "outstanding." On June 17, 1982, DeLia sent Menard a second letter again praising his "outstanding performance" at Wang. First Security concedes that during his first 16 months as Wang Operation Manager Menard performed his duties adequately. However, defendant presented evidence that during the summer of 1982 Menard's performance deteriorated. Thomas DiLillo, Wang's Director of Worldwide Facilities Operation, stated in a deposition that during the summer of 1982 he met with First Security's President, Robert Johnson, and Vice–President, John Cauley, and complained to them about communication problems between Wang and Menard. In this meeting DiLillo specifically called to the attention of Johnson and Cauley problems that Wang was

---

1. By handwritten notation on the face of First Security's motion for summary judgment, the district judge stated that "summary judgment must enter for the defendant on Count I of the complaint. *Dea v. Look,* [810 F.2d 12 (1st Cir. 1987)]. Since this ruling disposes of the only federal question in this case, the remainder of the action is dismissed without opinion to the merit of those claims." Menard moved to alter the judgment arguing, *inter alia,* that the court had jurisdiction over the state law breach of contract claim because of the parties' diverse citizenship. First Security filed an opposition to the motion to alter the judgment. The district court denied plaintiff's motion and entered judgment for defendant on the breach of con-

tract claim, "on the grounds urged in the defendant's brief."

Although there is, of course, no occasion for the district court to make findings of fact, as such, when ruling upon a motion for summary judgment, Fed.R.Civ.P. 52(a), it would be helpful in a case such as this for a reviewing court to have the benefit of a more substantial description than was presented here of the factual basis for the court's rulings. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 n. 6, 106 S.Ct. 2505, 2511 n. 6, 91 L.Ed.2d 202 (1986).

2. Menard has not appealed from the summary judgment on the bonus claim.

having with Menard, and with the general operation of First Security. DiLillo testified that, prior to Menard's assignment as Operation Manager, Wang had not had any major problems with First Security. DiLillo described the problems Wang was having while Menard was Operation Manager as "major problems," specifically complaining that there was no accurate communication between First Security and Wang. Shortly after the meeting between DiLillo and Johnson, Menard was transferred out of Wang. DiLillo testified that relations between the two corporations, as well as First Security's general performance, improved when a new area manager was assigned.

Menard was transferred to a sales and marketing position in southern Connecticut in August 1982. While acting as salesperson in Connecticut, Menard asserts that he was instrumental in obtaining several new clients for First Security. Defendant's evidence was less favorable, although recognizing that Menard was of assistance in getting one major account. For present purposes we accept plaintiff's assertion that he performed well while at his post in Connecticut.

In March 1983 Menard was again transferred, this time to the post of Assistant Area Manager in Boston. First Security concedes that plaintiff performed his duties adequately during his brief four months in this position. Due in part to his adequate performance in Boston, Menard was transferred in July 1983 to the post of Framingham Area Manager. Both parties agree that this was a promotion.

Prime Computer, Inc., is one of defendant's most important clients in the Framingham area, generating approximately $1.1 million and $1.2 million in business for First Security in 1983 and 1984. Menard admits that while he was Framingham Area Manager, Prime Computer had frequent day-to-day problems with defendant's services. Richard Guilmette, Prime Computer's Manager of Corporate Security and Safety, testified in a deposition that during the time Menard was First Security's Area Manager, Prime Computer had so many problems in its relations with First Security that it considered terminating the contract between the parties. In December 1983 Guilmette requested and obtained an emergency meeting with First Security's President, Robert Johnson, to discuss the problems Prime Computer was experiencing. Guilmette specifically complained to Johnson about poor communication between the two corporations, understaffing, and lack of uniforms for the security officers. Guilmette threatened to terminate the account if the problems were not satisfactorily resolved. After the meeting, Johnson sent a letter to Dennis Moschella, Prime Computer's Operation Manager, and to Guilmette, assuring, among other things, that "whatever communications difficulties that have existed in the past will be corrected immediately and in a manner that assures no repetition."

Johnson decided to terminate Menard in March 1984. Menard was replaced as Framingham Area Manager by Patrick Curran, then 30 years old. Guilmette testified that Prime Computer has not experienced any major problems in its account with First Security since the removal of Menard as Area Manager.

Menard argues that the problems that Wang and Prime Computer had with First Security while he was Area Manager were related to matters not under his control. He alleges that the only reason for the action against him was to discriminate because of his age.

## II.

A motion for summary judgment must be granted if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Not every factual dispute will defeat a motion for summary judgment.

[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986) (emphasis in original). *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). We have recently restated the standard of review in an appeal from a judgment granting a motion for summary judgment:

> [W]e must view the record in the light most favorable to the party opposing the motion, and must indulge all inferences favorable to that party. The party opposing the motion, however, may not rest upon mere allegations; it must set forth specific facts demonstrating that there is a genuine issue for trial.

*Oliver v. Digital Equipment Corp.,* 846 F.2d 103, 105 (1st Cir.1988) (citing *Metropolitan Life Insurance Co. v. Ditmore,* 729 F.2d 1, 4 (1st Cir.1984); *King v. Williams Industries, Inc.,* 724 F.2d 240, 241 (1st Cir.), *cert. denied,* 466 U.S. 980, 104 S.Ct. 2363, 80 L.Ed.2d 835 (1984)). Summary judgment will be precluded if there is a dispute "over facts that might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

■ Plaintiff alleges he was fired because of his age. Under the ADEA the plaintiff must prove that age was the determinative factor in his discharge, *i.e.,* that he would not have been discharged but for his employer's motive to discriminate against him because of his age. *Loeb v. Textron, Inc.,* 600 F.2d 1003, 1019 (1st Cir. 1979). A prima facie case of age discrimination is made by showing that 1) plaintiff was within the protected age group; 2) he was demoted or discharged; 3) he was replaced by a younger person or a person outside the protected age group; and, 4) he was qualified to do the job. *Dea v. Look,* 810 F.2d at 14 n. 1. Once the plaintiff has carried out his burden of proving a prima facie case, the burden then shifts to the employer to *articulate,* not prove, a non-discriminatory reason for its action. If the defendant articulates lawful reasons for its action, the presumption created by the prima facie case is dissolved, and plaintiff must then prove by a preponderance of the evidence that the defendant's true motive

was age discrimination. *Loeb v. Textron, Inc.,* 600 F.2d at 1011. *See Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252-56, 101 S.Ct. 1089, 1093-95, 67 L.Ed.2d 207 (1981).

■ First Security argues that summary judgment was proper in this case because Menard failed to establish a prima facie case of age discrimination. First Security does not dispute that Menard is within the protected age group, that he was fired, and that he was replaced by a younger person. But it asserts that Menard has failed to show that he was performing his job at a level that met defendant's legitimate expectations. Moreover, First Security argues that the evidence clearly shows Menard was not qualified for the job.

To establish that he was "qualified" a complainant must show "that he was doing his job well enough *to rule out the possibility* that he was fired for inadequate job performance, absolute or relative." *Loeb v. Textron,* 600 F.2d at 1012 (emphasis added). It is uncontroverted that First Security was having problems with Prime Computer at the time plaintiff was fired. It is also undisputed that defendant had problems with Wang Laboratories while Menard was the manager in charge of that account.

In his deposition, Thomas DiLillo clearly stated that during the summer of 1982 he expressed to First Security's management Wang's dissatisfaction with Menard's performance:

Q. You've never voiced dissatisfaction with an area manager per se?

A. Well, we have in the sense that in Gene Menard's case, about information not being presented in a way that best represents both First Security or Wang Laboratories.

Q. What do you mean, what information was presented?

A. Or communications. If shifts needed to be filled, if post orders needed to be posted, we would receive one set of communications from Mr. Menard and First Security would be receiving a different

set of communications. There just wasn't consistency.

DiLillo testified that Wang did not have that type of problem prior to Menard's assignment and that the situation improved substantially when Menard was replaced.

The problems that First Security had with Wang while Menard was in charge of that account repeated themselves when he was assigned to the Prime Computer account. Although Guilmette, from Prime Computer, did not state that Menard was directly responsible for the problems, he complained to Johnson that there were major communication problems between both companies. The problems were so serious that Guilmette threatened to terminate the account. Guilmette testified that the problems disappeared when a new Area Manager was assigned to the account.

DiLillo's and Guilmette's testimony is strong evidence that Menard was not performing his job satisfactorily: it indicates that two of defendant's major clients complained of communication problems while plaintiff was in charge of their accounts. The problems that Wang and Prime Computer had were strikingly similar. Both DiLillo and Guilmette testified that they had never had similar problems prior to Menard's assignment to their accounts. Moreover, both witnesses testified that First Security's delivery of services improved once Menard was removed from the accounts.

Menard, rather than contesting Wang's and Prime Computer's assessment of the situation, argues that the problems that First Security had were unrelated to his supervisory functions. To satisfy the fourth element of a prima facie case—that he was qualified for the job—Menard submitted the affidavit of his supervisor, Robert Jackson. Jackson, who served as District Manager for First Security in 1983, basically stated that plaintiff was doing an excellent job. Jackson acknowledged that Prime Computer was having some problems with First Security but stated those problems were not related to Menard's duties. Jackson, however, was not aware of the magnitude of those problems. Jack-

son was not involved in, nor informed of, any of the discussions between Prime Computer and First Security. Prime Computer's Manager, Guilmette, testified that he complained directly to Johnson. Guilmette did not complain to Jackson. The latter was not present at the meeting between Guilmette and Johnson. In his affidavit Jackson stated,

I was never informed in December of 1983 that Robert Johnson was meeting with Prime Computer representatives. I was never given a copy of the letter Mr. Johnson allegedly sent Prime following such meeting. At no time following such alleged meeting was I instructed to handle Prime's account any differently nor was I instructed to discuss with Mr. Menard any problems raised by Prime Computer.

It is clear therefore that Jackson did not have knowledge of the full extent of the serious problems that defendant was having with its Prime Computer account. He was kept completely out of the discussion. In addition, Jackson was himself discharged by the company in February 1984, soon after the December 1983 meeting between Guilmette and Johnson. Menard was fired in March 1984.

Menard also sought to establish he was qualified by relying on the two letters he received in 1982 from his supervisor at that time, Ronald DeLia. Menard was fired in 1984. The problems with Prime Computer arose toward the end of 1983. An evaluation of Menard's performance in 1982 is not directly relevant to the issue of whether he was qualified at the time of his discharge. Moreover, DeLia's letters do not establish that Menard performed satisfactorily in his first assignment as Wang Operation Manager in 1982. DeLia's last letter is dated June 17, 1982. At that time Menard had been in his assignment at Wang for 16 months. It is precisely during that summer that Thomas DiLillo from Wang complained to Johnson about Menard's communication problems. DiLillo did not communicate his complaint about Menard to DeLia. The latter, therefore, was not aware of the fact that Wang was not satisfied with Menard's performance. Moreover,

Menard was transferred from Wang in August 1982; DeLia's last letter is dated June 17, 1982. That letter does not establish that Menard performed satisfactorily at Wang during the summer of 1982. In summary, we do not think that Jackson's testimony and DeLia's letters are sufficient to raise a genuine issue as to whether Menard was performing his job well enough "to rule out the possibility" that he was discharged for inadequate performance. *Loeb,* 600 F.2d at 1013. *See Oliver v. Digital Equipment Corporation,* 846 F.2d 103, 107–08 (1st Cir.1988).

■ Even, moreover, if we were to accept that Menard's qualifications sufficed to establish a prima facie case, we would not necessarily reject the court's award of summary judgment.

> [I]t is clear that merely making out a prima facie case does not automatically save appellant from a summary judgment motion. "Indeed, the inference of discrimination created by the prima facie case is dispelled once the employer's reason is stated, until and unless the latter is shown to be a pretext."

*Dea,* 810 F.2d at 15–16 (quoting *Loeb v. Textron,* 600 F.2d at 1015). There can be no question here that First Security has satisfied the burden of "articulating" a non-discriminatory reason for the discharge: Menard was discharged, according to First Security, as a result of criticisms received from two of First Security's largest clients.

■ Once the defendant has satisfied its burden of producing a valid non-discriminatory reason for its action, and the effects of the prima facie case are dispelled, the plaintiff has the burden of proving, by a preponderance of the evidence, that defendant's articulated reason was pretextual, and that the real reason for discharge was age discrimination. *Id.* To create a genuine issue as to the existence of such a pretext, plaintiff relies on allegations—chiefly his own testimony and the affidavit of Jackson—that he was performing his job satisfactorily, that he communicated regularly and frequently with representatives of Prime Computer, and that none of Prime Computer's dissatisfactions related to areas within Menard's responsibility. Menard is basically arguing that he was not responsible for the problems that the company was having with Prime Computer, and thus, that defendant's stated reasons for his discharge must be a pretext.

The issue in this ADEA action, however, is not whether First Security made a wise decision in determining that its problems with Prime Computer reflected adversely upon Menard. The issue is whether First Security fired Menard because of his age. We reiterated in *Dea* that a claimant

> cannot meet his burden of proving "pretext" simply by refuting or questioning the defendants' articulated reason. *White v. Vathally,* 732 F.2d 1037, 1042 (1st Cir.), *cert. denied,* 469 U.S. 933 [105 S.Ct. 331, 83 L.Ed.2d 267] (1984)
>
> > Merely casting doubt on the employer's articulated reason does not suffice to meet the plaintiff's burden of demonstrating discriminatory intent, for "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons" in the first place. To hold otherwise would impose an almost impossible burden of proving "absence of discriminatory motive."

*Dea v. Look,* 810 F.2d at 15 (quoting *White v. Vathally,* 732 F.2d at 1043 (quoting *Texas Department of Community Affairs v. Burdine,* 450 U.S. at 253–54, 101 S.Ct. at 1093–94)). Here, as in *Dea,* Menard's proffered evidence does little but dispute the objective correctness of First Security's decision. That is, while not disputing that First Security's two clients were indeed unhappy at the times he was Manager, Menard insists that he was not to blame. But even assuming it could be shown that First Security was wrong to blame him, this would be insufficient to prove pretext or discriminatory intent. The evidence suggests no other reason for his discharge than the Prime Computer imbroglio.

Menard also argues that he produced direct evidence of discrimination, evidence which by itself is sufficient to establish a

jury question without relying on the burden-shifting framework of the prima facie case. *See Loeb*, 600 F.2d at 1017 ("an individual complainant in some cases may be entitled to his day in court without having to prove each element of the ... prima facie case where he has presented direct evidence of discrimination"); *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 621, 83 L.Ed.2d 523 (1985). Menard argues that the district court had before it evidence of two instances where First Security admitted it had discharged Menard because of his age. This evidence, Menard argues, suffices to defeat defendant's motion for summary judgment.

In his deposition Menard stated that when he was informed by Kenneth Jenkins, defendant's Vice–President for Security Services, that his services were to be terminated, he asked Jenkins if the reason for the discharge was his age, and Jenkins did not respond.[3] Menard argues that Jenkins's silence constitutes an admission of discriminatory intent by First Security.

A party may be deemed to have admitted a proposition by silence "only if it would have been natural under the circumstances to object to the assertion in question." *United States v. Hale*, 422 U.S. 171, 176, 95 S.Ct. 2133, 2136, 45 L.Ed.2d 99 (1975). However, "[i]n most circumstances silence is so ambiguous that it is of little probative force." *Id.* We do not find Jenkins's silence sufficient to defeat an otherwise properly supported motion for summary judgment. Given the context and circumstances of the termination discussion, Jenkins would not normally have been expected to respond to Menard's inquiry. Immediately prior to Menard's question, Jenkins had conveyed to Menard the company's decision to discharge him, stating that "there was no place for [Menard] in the company." Although Jenkins had discussed Menard's situation with First Security President, Johnson, the decision to terminate Menard was made solely by Johnson. Jenkins was merely notifying Menard of the decision made by Johnson. Jenkins therefore was not the person with all the adequate information to give Menard a full explanation for First Security's decision. Menard did not accuse Jenkins personally of any wrongdoing. Jenkins was not compelled to deny anything because he was not personally charged with doing anything. Under these circumstances we do not construe Jenkins's silence as an admission by First Security, and find it to be "of little probative force," *United States v. Hale*, 422 U.S. at 176, 95 S.Ct. at 2136, to show discriminatory intent.

Menard also argues that certain deposition testimony by First Security Vice–President, John Cauley, constitutes direct evidence of discrimination. Cauley testified that Rick Avery, Menard's predecessor as Framingham Area Manager, also had problems managing the Prime Computer account. Avery was approximately 25 years old at the time, and was performing his *first* managerial assignment with First Security. As a result of the problems with Prime Computer, Avery was demoted and transferred. Cauley was asked at his deposition why Avery was transferred and not fired as a result of his performance problems, which were similar to the ones Menard later had. Cauley responded, in full,

He was young, it was his first job. He had learned a lot we felt and it hadn't cost us the ultimate. He deserved another chance, which we'd have done for anybody else.

Menard characterizes this response as an admission of discriminatory intent. We disagree. Cauley's statement has to be construed in the context of the different factual background of Avery's and Menard's cases. Although Cauley did enumerate Avery's youth as one of the reasons why Avery was not fired, he also emphasized that Avery was performing his first job for defendant. To that extent Avery's position was similar to Menard's when the

---

**3.** Jenkins expressly denied remaining silent. He testified in a deposition that, when Menard asked whether he was being terminated on account of his age, Jenkins responded that "age had absolutely nothing to do with this." However, for summary judgment purposes, we accept Menard's statement of the facts.

latter first had problems with the Wang account during his first assignment for First Security. In both cases First Security treated them the same way: they were given another opportunity and transferred to a different position. In addition, Prime Computer's problems with First Security during Menard's tenure seem to have exceeded those experienced in Avery's time. Richard Guilmette of Prime Computer testified that he requested a meeting with First Security's President, and threatened at this time to terminate the account. We are unable to agree, therefore, that the record indicates some meaningful disparity in the company's treatment of Menard and Avery from which to draw a reasonable inference of age discrimination.

We conclude that Menard did not produce direct or circumstantial proof of age discrimination sufficient to defeat defendant's motion for summary judgment.[4] The evidence presented by Menard, viewed in the light most favorable to him, is insufficient to create a genuine issue of material fact as to whether " 'but for' his employer's motive to discriminate against him because of his age, [Menard] would not have been discharged." *Loeb*, 600 F.2d at 1019. The district court did not err in granting defendant's motion for summary judgment.[5]

### III.

Menard also claims that he was discharged in violation of the policies and procedures set forth in First Security's Personnel Handbook. The handbook provides that employees will be subject to progressive discipline and will not be discharged in the absence of repeated violations of defendant's rules, except when they commit a "category II offense," which could result in a discharge without warning. Based on these dispositions in the handbook, plaintiff brought a contract claim under Massachusetts law. Defendant's witnesses deposed that the handbook was never intended to apply to managerial employees such as Menard. The district court granted summary judgment for defendant on this claim.

The pertinent facts relative to Menard's contract claim are as follows: On January 30, 1981, Robert Johnson sent Menard a letter welcoming Menard "as a member of First's management team." The letter sets forth Menard's duties, salary, benefits and commencement date. Menard acknowledged in his deposition that this letter constituted his employment agreement with First Security. No reference is made in the letter to any particular terms of employment, to any permissible or non-permissible grounds for discharge, or to the personnel handbook.

Sometime after commencement of his employment, Menard received a copy of the First Security Personnel Handbook during a meeting of the company's managers. Menard asserts in an affidavit that nobody from First Security stated in that meeting that the manual was not applicable to managers, or that its terms were not part of his employment contract. However, in his deposition Menard also admitted that nobody from First Security told him or the other managers that the handbook *was* part of

---

**4.** Menard makes passing reference to the "fact" that First Security fired its two oldest managers, Menard and Robert Jackson, and that all the new managers hired after 1983 were under 40. However, a third manager, Lennie Moniz, was terminated in 1985. Moniz was then only in his late 30s. Jackson, moreover, does not assert in his affidavit that he was discharged due to his age.

The above figures are too small to constitute meaningful statistical proof of discrimination. Evidence that one other person within the protected group was also fired is too limited to give rise to a reasonable inference of discriminatory intent. *See Mayor of Philadelphia v. Education Equality League,* 415 U.S. 605, 620–21, 94 S.Ct.

1323, 1333–34, 39 L.Ed.2d 630 (1974). We note that Menard when hired was already age 52, making it seem less likely that his discharge three years later was based on company prejudice against older people.

**5.** Plaintiff does not argue in his brief that the district court erred in granting summary judgment for defendant on plaintiff's claim under the Massachusetts Anti–Discrimination Act, Mass.Gen.Laws ch. 151(B) (1982 & Supp.1988). We note, however, that the burden of proof under the Massachusetts Anti–Discrimination Act is similar to the one under the ADEA. *Lewis v. Area II Homecare For Senior Citizens,* 397 Mass. 761, 493 N.E.2d 867, 870–71 (1986).

their employment contract or that it was applicable to managerial employees. Menard never received any letter or memo with the handbook indicating that it applied to him. He was not asked to acknowledge its receipt by signing or otherwise. The handbook is silent as to the category of employees covered—although its contents seem mainly relevant to non-managerial employees such as security guards.

In its motion for summary judgment on the contract claim First Security argued that 1) Massachusetts law does not recognize a contract claim based on an employee manual; 2) even if under Massachusetts law an employee manual might form part of the employment contract, in the instant case the manual was not part of the contract between First Security and Menard. The district court entered summary judgment for First Security "on the grounds urged in the defendant's brief."[6]

The Massachusetts Supreme Judicial Court has never discussed whether and when an employee manual may become a binding contract between the employer and the employee. The only decision from a Massachusetts court on this issue is that of the Massachusetts Appeals Court, *Garrity v. Valley View Nursing Home, Inc.*, 10 Mass.App. 822, 406 N.E.2d 423 (1980). The appeals court there held that the superior court had erred in not accepting a finding of the district court that the terms and provisions of defendant's personnel manual formed a part of the employment contract. In *Garrity*, the district court found as a fact *inter alia* that the employer had required the employee to sign the personnel manual, and that the employee had signed

it. *Id.* 406 N.E.2d at 424. Assuming that the SJC will follow *Garrity*, and recognize that in a proper case an employee manual can form part of the employment contract, *see Treadwell v. John Hancock Mutual Life Insurance Co.*, 666 F.Supp. 278, 287–88 (D.Mass.1987), we do not think that the present record suffices to establish a fact issue over whether the First Security Personnel Handbook became a part of the contract between Menard and the defendant.

The handbook was not presented to Menard at the time he was hired. There was no evidence that he relied upon it in accepting a position with First Security. The letter sent by First Security's President to Menard, which the latter agrees constituted his employment contract,[7] made no reference to the handbook or to its contents. Unlike the situation in *Garrity*, the handbook was not signed by Menard, nor was he requested to do so. Menard did not present any evidence showing that the manual was meant to apply to his position as Area Manager or to his particular employment contract. His only claim is that he "assumed" that it applied to him and was part of his employment contract. The only evidence with regard to the handbook that was before the district court, in addition to the handbook itself and Menard's allegation, was a First Security interoffice memorandum dated August 31, 1981, notifying *all uniformed security officers and sergeants* that the handbook had been revised, discussing briefly the contents of the revised handbook, and asking them to read it. Menard was not a uniformed security officer or a sergeant. He was part of First

---

**6.** *See* note 1, *supra.*

**7.** In *Bernard v. Cameron & Colby Co.*, 397 Mass. 320, 491 N.E.2d 604 (1986), the Supreme Judicial Court repeated, in respect to proving implied contractual terms,

"Every instrument in writing is to be interpreted, with a view to the material circumstances of the parties *at the time of the execution,* in light of the pertinent facts within their knowledge and in such manner as to give effect to the main end designed to be accomplished.... [The] instrument is to be so construed as to give effect to the intent of the ... [parties] as manifested by the words used illumined by all the attendant factors, unless

inconsistent with some positive rule of law or repugnant to other terms of the instrument. An omission to express an intention cannot be supplied by conjecture. But if the instrument as a whole produces a conviction that a particular result was fixedly desired, although not expressed by formal words, that defect may be supplied by implication and the underlying intention ... may be effectuated, provided it is sufficiently declared by the entire instrument."
491 N.E.2d at 605–06 (emphasis in original) (quoting *Dittemore v. Dickey,* 249 Mass. 95, 104–05, 144 N.E. 57 (1924)).

Security's management team. Details in the handbook itself seem to relate to employees below a managerial level and defendant's officers testified that, in fact, the handbook did not apply to managers like Menard. Given all these facts, which are essentially undisputed, we think the district court could properly determine that the handbook did not, under Massachusetts law, form part of the employment contract between First Security and Menard.

*Affirmed.*